1        HONORABLE RONALD B. LEIGHTON

2

3

4

5

6                        UNITED STATES DISTRICT COURT
7                        WESTERN DISTRICT OF WASHINGTON
                                AT TACOMA
8
    MARY LEE ANDISON, et al.,              CASE NO. C14-5492 RBL
9
                           Plaintiff,      ORDER ON MOTIONS FOR
10                                          SUMMARY JUDGMENT
          v.
11                                          [Dkt. #s 37, 41, 53, & 86]
    CLARK COUNTY, et al.,
12
                           Defendant.
13

14        THIS MATTER is before the Court on the following Motions:  The Clark County

15   Defendants' Motion for Summary Judgment [Dkt. #37]; The City of Vancouver Defendants'

16   Motion for Summary Judgment [Dkt. #41]; the Plaintiffs' Motion for Partial Summary Judgment

17   [Dkt. #53]; and the City's Motion to Exclude Plaintiffs' Expert Testimony regarding bullet

18   trajectory [Dkt. #86].  The case[1] involves a June 2011 incident at the Andison home.  Mary Lee

19   Andison was despondent, intoxicated and possibly suicidal, and her daughter Chrissy, a nurse,

20   called 911 for help.  Two Clark County Deputies (Defendants Shea and Hockett) responded first.

21   _____

22        [1] Despite the relatively short duration of the event (3 hours), the number of participants
     and points of view make this a very detailed factual story, as evidenced by the sheer bulk of the
23   parties' filings and supporting material, which the Court has read.  The parties and the Court are
     aware of the facts and of the factual disputes, and the Court has already outlined some of them in
24   a prior order [Dkt. # 26].

1  Andison was locked in a bonus room above the garage, possessing what she and her family

2  described as (and what ultimately turned out to be) a starter's pistol, incapable of firing a bullet.

3  The Andison family repeatedly asked the officers to leave, and to allow her husband (Plaintiff

4  Dr. Bruce Andison) access to her, but they refused.  Deputy Shea located Andison, and saw that

5  she had a pistol with a "red end."  Andison told him it was a starter pistol.   He radioed[2] "Gun!

6  Gun! Gun!," retreated and called the SWAT team.  Deputy Hockett later reported that he "might

7  have" heard a shot.  And it is a fact that he later reported that there was "no shot,"

8  notwithstanding the Defendants'' effort to explain what he meant by that report.

9          In any event, the SWAT team (made up of two dozen Clark County Deputies and

10  Vancouver Police Officers) soon arrived and set up what the Andisons describe as a "siege."

11  Over the next two hours officers searched the home, and set up a remote camera in an attempt to

12  determine what Andison was doing and to check on her welfare. When the camera was not

13  successful, Defendant Deputy Kasberg fired multiple non-lethal 40mm rounds to blow open or

14  "shatter" the door and, when that did not work, the window.  They did so over the Andison

15  family's objections and despite the fact there was a key to the bonus room in the door.

16          The projectiles and the sounds had the not-unpredictable effect of flushing Andison out

17  of the room, where she (according to the Defendants) walked down the stairs pointing the starter

18  pistol at officers.  Defendant Officer Junker (a sniper) shot her in the head—he claims in the

19  _____

20          [2] The City describes Deputy Shea as "extremely scared," "incredibly frightened," and
   "crying for his life." [Dkt. #41 at 4, 5, and 18].  The intent is apparently to portray the situation
21  as dramatically as possible, but it doesn't paint the deputy in a very professional light.  The
   City's filings tend in this direction throughout, both in overstatement of the what the evidence
22  shows when viewed in the light most favorable to it, and ignoring what it demonstrates when
   properly viewed in the light most favorable to the Andisons.  It also describes the Andison
23  family in dismissive tones (for example, it concedes only that daughter Chrissy *claims to be* a
   nurse," but it is not debatable that she is in fact a nurse.)  There are other unwarranted, similarly
24  contemptuous references.

face; Andison claims she was shot in the back of her head.  Andison went down, alive but injured, and unable or unwilling to move or show her hands.  Deputy Kasberg could not see the starter's pistol, so he shot her in the legs with two additional less-than-lethal 40mm rounds.  This further injured her, and moved her so that the starter's pistol was visible.  Andison was airlifted to the hospital, and she survived.

She and her husband, Bruce, sued the City and County, and the deputies and officers[3] involved, for violating their Fourth Amendment rights (search, seizure and excessive force).  They also assert related state law claims for negligence, assault, and false imprisonment.

The County Defendants argue that none of its officers violated Andison's constitutional rights, and that they are entitled to qualified immunity even if they did.  The County itself argues it has no *Monell* liability absent any underlying violation.  The County Defendants argue that the state law assault claim falls with the excessive force claim, that the negligence claim is barred by the public duty doctrine, and that the false imprisonment claim has no factual basis because Andison was never arrested or imprisoned.

The City Defendants similarly argue that they are qualifiedly immune, and emphasize that they are not liable for the conduct of others in any event.  They also argue that state law claims fail as a matter of law.  The Andisons have abandoned any *Monell* claim against the City, and to the extent they asserted one, that claim is DISMISSED with prejudice.

---

[3]  The County Defendants are SWAT co-commander Atkins, Deputies Shea and Hockett, Deputy Beiber (who had on-the-ground control over at least some aspects of the SWAT team's activities, and entered the home), Deputy Sofianos (who apparently only operated a "Pointman" remote camera), Deputy Kasberg (who fired the 40mm rounds) and Deputy Muller (who participated in the decision to shoot the less lethal rounds and also entered the home).
The City defendants are Holloway (the other co-commander) Officer Henderson (who had some command authority and entered the home), Officer Junker (the shooter) and Officer Williams (who participated in the decision to breach the door and window with the 40mm rounds and also entered the home).

1    The Andisons also move for partial summary judgment in their favor, on the limited issue

2    of the viability of Defendants' affirmative claim that Dr. Bruce Andison was "at fault" for the

3    injuries suffered by his wife, due to what they claim was medical negligence on his part[4], pre-

4    dating the events of June 2011.

5        The Andisons argue that there are material issues of fact surrounding all of the events—

6    including specifically whether the officers knew Andison had only a starter's pistol; whether she

7    pointed it and whether Junker shot her in the face or the back of her head.  More broadly, they

8    argue that the constitutional violations are not limited to the sniper shot.  They argue that

9    presence of a SWAT team was itself an unreasonable invasion, and that use of the "less lethal"

10   40mm rounds before and after she was shot was unreasonable and unconstitutional. They argue

11   that, viewing the facts in the light most favorable to the Andisons, the officers did not face the

12   exigent circumstance they claim, and they entered and searched the home without permission or

13   cause.  They claim the officers should have left or at least allowed Bruce Andison to talk to his

14   wife rather than force a full SWAT team confrontation with her, and that all of these violations

15   were caused by the officers involved and their commanders.

16       And they argue that some of the disputed evidence—primarily, whether she fired the gun,

17   but also what it looked like at the time—has been irretrievably lost because the County

18   inexplicably but willfully cleaned the starter's pistol without permitting Andison to inspect it.

19   They claim that this spoliation leaves the fact finder unable to assess whether there was evidence

20   that the gun was fired, and perhaps whether it had a "red plug" on its end.  They ask[5] the Court to

21

22   _____

23       [4] Dr. Bruce Andison had been giving his wife anti-depressants without formally
     prescribing them for her.

24       [5] The Andisons also claim they are entitled to "all presumptive inferences that a thorough
     forensic analysis might have derived." [Dkt. # 58 at 19]  The Defendants claim that the gun was

1  determine that any factual issues turning on this evidence (whether it *was* fired, whether it *could*

2  be fired, whether it had a red tip) are issues of fact precluding summary judgment.

3  **DISCUSSION**

4  **A. Summary Judgment Standard.**

5         Summary judgment is proper "if the pleadings, the discovery and disclosure materials on

6  file, and any affidavits show that there is no genuine issue as to any material fact and that the

7  movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining

8  whether an issue of fact exists, the Court must view all evidence in the light most favorable to

9  the nonmoving party and draw all reasonable inferences in that party's favor.  *Anderson Liberty*

10  *Lobby, Inc*., 477 U.S. 242, 248-50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).

11  A genuine issue of material fact exists where there is sufficient evidence for a reasonable

12  factfinder to find for the nonmoving party.  *Anderson*, 477 U.S. at 248.  The inquiry is "whether

13  the evidence presents a sufficient disagreement to require submission to a jury or whether it is so

14  one-sided that one party must prevail as a matter of law."  *Id*. At 251-52.  The moving party

15  bears the initial burden of showing that there is no evidence which supports an element essential

16  to the nonmovant's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the movant

17  has met this burden, the nonmoving party then must show that there is a genuine issue for trial.

18  *Anderson*, 477 U.S. at 250.  If the nonmoving party fails to establish the existence of a genuine

19  issue of material fact, "the moving party is entitled to judgment as a matter of law."  *Celotex*, 477

20  U.S. at 323-24.

21

22

23

24  merely cleaned of blood but not otherwise altered.  Andison claims that attorney Lloyd "wanted"
    the gun cleaned, at the behest of defense experts.

**B.  Qualified Immunity.**

Andison asserts §1983 claims for violation of her Fourth Amendment rights.  She claims the individual defendants unlawfully searched her home (entering the home without a warrant, permission, or an exigency, and breaching the garage room with 40 mm rounds); and used excessive force (shooting her with a bullet and the additional 40 mm rounds).   The individual defendants argue that they are entitled to qualified immunity.

Under the qualified immunity doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The purpose of the doctrine is to "protect officers from the sometimes 'hazy border' between excessive and acceptable force." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)).  A two-part test resolves claims of qualified immunity by determining whether plaintiffs have alleged facts that "make out a violation of a constitutional right," and if so, whether the "right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 553 U.S. 223, 232 (2009).

Qualified immunity protects officials "who act in ways they reasonably believe to be lawful." *Garcia v. County of Merced*, 639 F.3d 1206, 1208 (9th Cir. 2011) (quoting *Anderson*, 483 U.S. at 631).  The reasonableness inquiry is objective, evaluating 'whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Huff v. City of Burbank*, 632 F.3d 539, 549 (9th Cir. 2011) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).  Even if the officer's decision is constitutionally deficient, qualified immunity shields her from suit if her misapprehension about the law applicable to the circumstances was reasonable. *Brosseau v.*

*Haugen*, 543 U.S. 194, 198 (2004). Qualified immunity "gives ample room for mistaken judgments" and protects "all but the plainly incompetent." *Hunter v. Bryant*, 502 U.S. 224 (1991).

**C. Fourth Amendment Claims.**

The first issue, then, is whether, viewed in light most favorable to Andison, there was a violation of her constitutional rights.

It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable. *Payton v. New York,* 445 U.S. 573, 590 (1980). The presence of exigent circumstances, however, provides a narrow exception to the warrant requirement. *United States v. McConney,* 728 F.2d 1195, 1199 (9th Cir. 1984), *abrogated on other grounds by Estate of Merchant v. C.I.R.,* 947 F.2d 1390, 1392 (9th Cir. 1991). Exigent circumstances include situations that would cause a reasonable officer to believe that entry into the home was necessary "to prevent physical harm to the officers or other persons." *Id.* In claiming an exigency exception, police bear the "heavy burden" to demonstrate an urgent need to justify warrantless searches based on specific and articulable facts. *LaLonde v. County of Riverside,* 204 F.3d 947, 957 (9th Cir. 2000) (citations omitted).

Andison argues that viewed in the light most favorable to her, there was no "exigency" permitting the officers to enter and search her home where her daughter (who had called 911) had "called them off" before Shea and Hockett arrived, and certainly before the entire SWAT team arrived. She emphasizes that she had committed no crime, and there was no reasonable basis for believing that the "hook" for entering—the gun—was real.

Defendants argue that they were called to a despondent woman, possibly suicidal and probably drunk, armed with what she claimed was a starter pistol. They point out that Plaintiff Bruce Anderson provided a schematic to the house, a key, and told them where the (other, all

rifles) firearms[6] were located.  Even if this cannot be construed as permission as a matter of law, it is clear that there was an "exigency" supporting the officers' "crossing the threshold" of the (main) Andison home without a warrant.  The officers engaged in the search of the main Andison home for persons and weapons did not violate the Fourth Amendment, and are qualifiedly immune from such claims even if they did.  These straight "warrantless entry" claims are not viable as a matter of law and they are DISMISSED with prejudice.

The Andisons' remaining Fourth Amendment claims are based on the use of 40 mm rounds on the bonus room while she was located there, and generally on the deployment of a SWAT team to respond to a woman with a starter pistol.  She also argues that the officers violated her Fourth Amendment rights by using excessive force, by shooting her in the head and then with additional 40 mm rounds.

"Apprehension by deadly force is a seizure subject to the Fourth Amendment's reasonableness requirement." *Wilkinson v. Torres*, 610 F.3d 546, 550 (2010) (citing *Graham v. Conner*, 490 U.S. 386, 395 (1989)).  The reasonableness of force is determined by "carefully balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001) (citing *Graham*, 490 U.S. at 396).  Courts assess the "quantum of force used to arrest" by considering "the type and amount of force inflicted." *Id.* at 1279–80.  A court assesses the governmental interests by considering a range of factors, including "the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the

---

[6] Andison points out that there was only one pistol in the home—the starter pistol, kept in the kitchen.  The entering officers were unable to locate that pistol in the kitchen, which is, as Andison claims, additional support for her claim that the officers had no reason to believe her "weapon" was anything other than what everyone told them it was: a non-functioning starter pistol.

1    officers or others, whether he was actively resisting arrest or attempting to evade arrest by

2    flight," or any other "exigent circumstances."  *Id.*  Where an officer has "*probable cause to*

3    *believe* that the suspect poses a threat of serious physical harm, either to the officer or to others,"

4    the officer may constitutionally use deadly force.  *Wilkinson*, 610 F.3d at 550 (citing *Tennessee*

5    *v. Garner*, 471 U.S. 1, 11 (1985)) (emphasis added).

6         Importantly, a court must judge reasonableness "from the perspective of a reasonable

7    officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.*  Courts are cautioned to

8    make "allowance for the fact that police officers are often forced to make split-second

9    judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount

10   of force that is necessary in a particular situation."  *Id.*  And, although the question is "highly

11   fact-specific," the inquiry is objective: a court must ask "whether the officers' actions are

12   'objectively reasonable' in light of the facts and circumstances confronting them."  *Id.* (citing

13   *Scott v. Harris*, 550 U.S. 372, 383 (2007); *Graham*, 490 U.S. at 397).  Addison argues that her

14   4th Amendment excessive force is viable and that the officers are not entitled to qualified

15   immunity on it.  She was not a threat to anyone, she had not committed a crime.  There was no

16   reason to "flush her out," but the barrage of 40 mm rounds predictably had that effect.  And,

17   when she did emerge, she was shot in the back of the head. Whether she pointed the starter pistol

18   at anyone is a question of fact, as is whether the officers knew it was not a real gun anyway.

19   Then, because she could not respond to the officer's commands to show her hands (due to the

20   head shot), she was shot two more times with the "less lethal"—but still damaging—40 mm

21   rounds.

22        Defendants argue that their respective actions were constitutional, and that, even if they

23   were not, it was not clearly established that their conduct was unconstitutional.

24

ORDER - 9

1       As an initial matter, the Defendants' motions are based largely on their own version of

2 disputed facts. The "circumstances" that they ask the Court to measure their conduct against are

3 not as clearly established as they suggest.  Both claim that Andison pointed the gun at them, and

4 ask the court to measure the necessity of the use of lethal force assuming that that was true.

5 Andison is perhaps not a reliable witness on some points (due perhaps to the injury she suffered)

6 but she claims she did point the gun at them.  But that is not the only, or even the first, issue.

7       Relying on the Defendants' version of the facts, for example, the County claims that the

8 officers "had no intention" of forcing Andison out of the bonus room when Kasberg fired 40mm

9 rounds at the door and window; they simply wanted access for the remote "Pointman" camera to

10 "check on her welfare."  [Dkt. # 37 at 4]  But the Court cannot so find on summary judgment;

11 whether or not they subjectively *intended* that result—an inquiry that is not permitted here—no

12 one could claim surprise that that was the result[7].  The reasonableness of the officers' decision to

13 breach the door is measured objectively, and it cannot be said as a matter of law that their course

14 was objectively reasonable in light of the information they had, the threat they faced, and the fact

15 that Andison's response to their strategy to check on her welfare was predictable, even if they

16 now claim they did not intend it.  That objectively foreseeable result was an *escalation* of the

17 situation; it did not ensure her welfare, their safety, or in any way diffuse the situation.  Even the

18 Defendants concede that Andison had committed no crime, and the Andisons point to twelve

19

20       [7] The City cites *Fisher v City of San Jose,* 558 F.3d 1069 (9th Cir. 2009*)* for the

21 proposition that an exigency supporting a warrantless entry lasts until the situation is over.  But *Fisher* also acknowledges the validity of a different Andison claim: law enforcement often uses

22 loud noises to drive a suspect out of her hiding place: "When those techniques failed to induce Fisher to surrender, the MERGE unit detonated a flash-bang device, and, on two occasions, they

23 shot canisters of tear gas into his apartment. *Nothing worked to dislodge Fisher from his home*." *Id*. at 1073 (emphasis added).

24

1    additional "facts" known to the officers that, they claim, made entire SWAT team response,

2    including perhaps misguided efforts to "monitor" her  unreasonable and unconstitutional under

3    the (disputed) circumstances.  [*See* Dkt. # 58 at 26].

4         The factual underpinning of the City's (and Officer Junker's) Motion is even more

5    troublesome.  Based on their own expert's opinion and Junker's testimony, they claim that he

6    shot her in the face (and not the back of the head), as a matter of law.  But the evidence is that

7    the wound on the back of her head was small, and the wound on her face was large[8].  The fact

8    that there was no tissue on the wall behind her is evidence, but it is not dispositive on the issue. It

9    would be similarly surprising that there was no tissue on the wall after a bullet passed through

10   Andison's head, front to back.  And the evidence that the bullet entered the back of the head is

11   based on the doctors' admissible opinions, as well as common sense.  Viewed in the light most

12   favorable to the non-moving party, the evidence is that Andison was shot in the back of the head.

13   There is of course evidence that she was shot in the face, and that evidence will be weighed by

14   the jury.  The Court cannot and will not resolve this factual question on summary judgment.

15        Viewed in the light most favorable to her, Andison has made out constitutional violations

16   by each officer who participated in the decision to fire the 40 mm rounds at the door and

17   window, or in actually doing it.  This appears to include Defendants Kasberg, Henderson,

18   Beiber, Muller, Junker and Williams.  Defendants Atkins and Holloway were the SWAT co-

19   commanders on site, and there is evidence they approved this course.  They too are potentially

20   liable for the unreasonable, more-intrusive-than-was-reasonable attempted entry into the bonus

21

22
          ───────────────
23        [8] The Defendants also ask the Court to Exclude the Andisons' expert (doctor) testimony
     about the path of the sniper's bullet, based in part on Defendants' own expert's opinion that
24   Andison was shot in the face.  Because the opinions are admissible, this Motion [Dkt. #86] is
     DENIED.

1   room.  These Defendants' Motion for Summary Judgment on this aspect of the Andisons' Fourth

2   Amendment claim is DENIED.  If and to the extent any other individual defendants are named in

3   this claim, their Motion is GRANTED and this claim against them is DISMISSED.

4          Andisons' claims for the unconstitutional use of force—the sniper shot and the

5   subsequent 40 mm rounds to the legs—are similarly viable.  Viewing the circumstances in the

6   light most favorable to her, the use of force was clearly not warranted in either case.  The

7   individual Defendants directly participating in these events appear to be Junker, Kasberg, and

8   Muller.  These Defendants' Motion for Summary Judgment on the Fourth Amendment Excessive

9   Force claim is DENIED.  Defendants Atkins and Holloway are potentially liable as supervisors

10  for ordering and approving the strategy leading to the sniper shot, and to the subsequent 40 mm

11  rounds. Their Motion is DENIED. If and to the extent any other individual defendants are named

12  for directly participating in this claim, their Motion is GRANTED and this claim against them is

13  DISMISSED.

14         Andison's claim that Shea, (who was the first responder who briefed the subsequent team

15  members), and Beiber and Henderson (who "shared some command") are responsible for "every

16  single instance of unlawful entry and unlawful use of force" is not supportable.  These "mid-

17  level" supervisors' Motion for Summary Judgment[9] on the excessive force claims is GRANTED.

18  **D.  *Monell* Claim.**

19         The Andisons claim that Atkins, the SWAT co-commander, was the County's "policy-

20  maker," and that as a result his decisions described above are the County's policy for purposes of

21  *Monell* liability.  They do not make any other *Monell* claim.

22

23  _____

        [9] None of the actionable conduct was even alleged to have been undertaken by Defendant
24  Sofianos.  All of the Andisons' claims against him are DISMISSED with prejudice.

1  In order to set forth a claim against a municipality under 42 U.S.C. § 1983, a plaintiff
2  must show that the defendant's employees or agents acted through an official custom, pattern or
3  policy that permits deliberate indifference to, or violates, the plaintiff's civil rights; or that the
4  entity ratified the unlawful conduct. *See Monell v. Department of Social Servs.*, 436 U.S. 658,
5  690-91 (1978); *Larez v. City of Los Angeles*, 946 F.2d 630, 646–47 (9th Cir. 1991). Under
6  *Monell*, a plaintiff must allege (1) that a municipality employee violated a constitutional right;
7  (2) that the municipality has customs or policies that amount to deliberate indifference; and (3)
8  those customs or policies were the "moving force" behind the constitutional right violation.
9  *Board of County Com'rs v. Brown*, 520 U.S. 397, 404 (1997). A municipality is not liable
10 simply because it employs a tortfeasor. *Monell*, 436 U.S. at 691. A municipality may be liable
11 for inadequate police training when "such inadequate training can justifiably be said to represent
12 municipal policy" and the resulting harm is a "highly predictable consequence of a failure to
13 equip law enforcement officers with specific tools to handle recurring situations." *Long v.*
14 *County of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006); *id.* (quoting *Board of County*
15 *Com'rs*, 520 U.S. at 409).

16  As the County points out, the Andisons' claim that Atkins was the County's policy maker
17 is not supportable as a matter of law; the county official responsible for policy-making in this
18 area is the sheriff. *See* RCW 36.28.010. The County's Motion for Summary Judgment on the
19 Andisons' Monell claim is GRANTED, and that claim is DISMISSED with prejudice.

20 **E.  State Law Claims.**

21  The parties agree that Andison's assault and battery claims rise and fall with excessive
22 force claims. Accordingly, this claim survives against the same defendants as the Fourth
23 Amendment excessive force claims. Furthermore, Andison's assault claims survive against both

24

ORDER - 13

1    the City and the County, because the "no respondent superior liability" rule applicable in §1983

2    cases does not apply in this context.

3          Andison also asserts state law negligence claims against all defendants, including the

4    City and County.  Defendants claim that the negligence claims are barred by the public duty

5    doctrine.

6          As a general rule, the state has no duty to protect the public from the actions of private

7    individuals.  *DeShaney v. Winnebago County Dept of Social Services*, 489 U.S. 189, 195 (1989).

8    ("Nothing in the due process clause requires the state to protect life, liberty, and property of its

9    citizens against invasion by private actors.")  There are two potentially applicable exceptions to

10   this rule: the existence of a special relationship, and "rescue doctrine."  *Johnson v. City of*

11   *Seattle*, 474 F.3d 634, 639 (9th Cir. 2007).  Plaintiffs claim that both exceptions apply.

12         Defendants argue that neither exception applies as a matter of law, because there is no

13   evidence of any express assurance and no evidence of any reasonable or actual reliance on any

14   such assurances.  Andison claims that she was given "express assurances" that the SWAT team

15   was there to "help" Mary Lee.  But there is no evidence whatsoever that either Bruce or Mary

16   Lee reasonably relied on such assurances—neither of them even claim they acted, or refrained

17   from acting, in reliance on any such assurance.

18         The Andisons' negligence claims are barred by the public duty doctrine and the

19   Defendants' motion for Summary Judgment on this claim is GRANTED.  The Andisons'

20   negligence claim is DISMISSED with prejudice.

21         The Andisons' false arrest/imprisonment claims fail as a matter of law because neither

22   was arrested or imprisoned by any Defendant, and those claims are DISMISSED with prejudice.

23

24

1  **F.  Andisons' Motion on Comparative Fault Affirmative Defense.**

2        In the months leading up to the incident, Dr. Bruce Andison gave his wife, Mary Lee,

3  anti-depressants without a psychiatric diagnosis or a prescription.  The Defendants have asserted

4  in a counterclaim that Bruce (and his employer) are "at fault" entities under Chapter 4.22 RCW.

5  The gist of the claim is that Mary Lee's June 2011 "episode" was caused in part by Bruce's

6  negligent medical care.

7        The Andisons' negligence claims have been dismissed, above.  This claim is not a

8  defense to the remaining constitutional claims, or to the state law assault claim.  This Motion is

9  DENIED as moot.

10

11        IT IS SO ORDERED.

12        Dated this 13th day of January, 2016.

13

14                                          Ronald B. Leighton
                                              United States District Judge
15

16

17

18

19

20

21

22

23

24

ORDER - 15